**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN BRESNAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:21-cv-00058 |
| | ) | |
| CITY OF SAINT PETERS, et al. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

Before the Court is Defendants' Motion for Summary Judgment, Doc. [111]. For the reasons set forth below, the motion is granted.

**FACTS AND BACKGROUND**[1]

Plaintiff Brian Bresnahan brings this action alleging that the City of St. Peters Police Department (the "Department") terminated him for exercising his First Amendment free speech rights. Doc. [28] ¶¶ 7-18. Plaintiff worked as a police officer for the Department from October 11, 2004, to June 10, 2020. Doc. [116] ¶¶ 28-29.

On June 9, 2020, at approximately 9:33 p.m., Plaintiff texted a group chat with his fellow shift officers and supervisors a link to a video clip from an animated TV show "Paradise PD." *Id.* ¶ 60. The video clip depicts a Black police officer who, upon seeing his reflection in the mirror, draws his gun and shoots.[2] *Id.* ¶ 62. The bullet bounces off the mirror and appears to hit the officer in his genital area. *Id.* Then, the video clip cuts to a news segment reporting on, as described by Defendants, "another innocent African-American man shot by police." *Id.* In the message accompanying the link, Plaintiff wrote "[t]his is mildly inappropriate, and I have verbally counseled myself." *Id.* ¶ 61. Plaintiff alleges that the video clip is a parody intended to "make fun of police officers, protestors, news media, and the commentators to help push narratives." Doc. [126-2] ¶ 62. A few minutes later, Sgt. Chad Kinsey texted Plaintiff directly, "Brian you need to be way more careful with this shit. I am not joking." Doc. [116] ¶ 69.

---

[1] Unless otherwise noted, the facts in this section are not disputed.

[2] Plaintiff does not challenge ¶ 62, but notes that "the shooting portion of the video is a small part which then gives context to the parody of the clip, which intended to 'make fun of police officers, protesters, news media, and the commentators to help push narratives.'" Doc. [126-2] ¶ 62.

Plaintiff apologized and stated that he "was trying to lighten the mood of the past few posts tonight." *Id.* ¶ 70. Sgt. Kinsey told Plaintiff that his conduct was inappropriate and that they had a problem because Plaintiff had sent his message to supervisors on the text chain. *Id.* ¶ 71.

"At approximately 10:05 p.m., Sgt. Kinsey viewed the [v]ideo [c]lip with his superior, Lt. Turnbough." Doc. [116] ¶ 76. Lt. Turnbough and Sgt. Kinsey decided to conduct an investigation and escalate the issue to Captain Milatovic and Chief Struttmann. *Id.* ¶¶ 83-84. Around 10:45 p.m., Officer Shaunta Reece,[3] a Black officer who worked the midnight shift with Plaintiff, texted the group:

> Bresnahan, unfortunately, I'm not the least bit surprised you would assume this video mocking innocent black men being shot by police is entertaining. Now, I am a patrol officer. I do not get paid to address offensive, racist, inappropriate shit like this! But there is one Lieutenant and three Sergeants in this group text. With all due respect, this needs to be addressed immediately!

*Id.* ¶ 92. Sgt. Kinsey and Lt. Turnbough met with Officer Reece at the police station shortly thereafter to discuss the situation. *Id.* ¶¶ 107-09. Lt. Turnbough advised Officer Reece that the Department would conduct a full investigation "with conclusion and outcome." *Id.* ¶ 109. According to Plaintiff, with the approval of his supervisors, Plaintiff met with Officer Reece towards the end of their shift, apologized, and reassured her that she would never see anything like that from him again. Doc. [126-1] ¶ 14. Plaintiff believed that he had made amends with Officer Reece. Id. ¶ 15. When asked in her deposition if "Brian sending that message that night affects your ability to work with him," Officer Reece responded, "no." Doc. [126-1] ¶ 13; Doc. [114-13] at 60:1-3. Sgt. Kinsey and Lt. Turnbough also met with Plaintiff during his shift. Doc. [116] ¶ 104. The parties disagree about whether Plaintiff was told at that time that an investigation was being initiated. Docs. [116] ¶ 105, [126-2] ¶ 105.

The next morning, Lt. Turnbough briefed Captain Milatovic about Plaintiff's conduct, Officer Reece's objections, and his meetings with both Plaintiff and Officer Reece. Doc. [116] ¶¶ 111-12. Captain Milatovic believed that Plaintiff's conduct potentially violated various Department and City Policies, including the Department's Discriminatory Harassment policy and the City's Anti-Harassment and Anti-Discrimination policies. *Id.* ¶ 118.

---

[3] Plaintiff claims "the record is unclear on whether officer Reece's name is Shanta or Shaunta." Doc. [126-2] ¶ 27. The Court adopts the spelling provided by Officer Reece's employer and by Officer Reece herself in her deposition. *See* Doc. [116] ¶ 27; Doc. [114-13] at 5:24.

Captain Milatovic decided to report Plaintiff's conduct to Police Chief Rick Struttmann. *Id.* ¶ 126. Chief Struttmann directed Lt. Jay Hultz to investigate Plaintiff's conduct. *Id.* ¶ 141. Plaintiff ended his shift and went home around 6:00 a.m. *Id.* ¶ 110. Around 9:45 a.m., Lt. Hultz instructed Plaintiff to report to the station by 10:00 a.m. *Id.* ¶ 142. By 10:15 a.m., Plaintiff's resignation form was completed and signed. Doc. [126-1] ¶ 21.

When he arrived at the station after only two hours of sleep, Plaintiff was escorted into Chief Struttmann's office and told that he had put his fellow officers' lives in danger with his actions. Doc. [126-2] ¶¶ 143-44; Doc. [126-1] ¶ 21. Plaintiff reports that prior to "being marched into the Chief's office, Plaintiff was subjected to awkward silence in Lieutenant Hultz's office." Doc. [126-2] ¶ 143. According to Plaintiff, Chief Struttmann asked Plaintiff to "resign immediately, or there would be an investigation that would go to city hall. At the end of that investigation, [Chief Struttmann] was going to recommend that [Plaintiff] be terminated." Doc. [116] ¶ 145 (alteration in original). Plaintiff reports that he eventually gave in after being asked repeatedly and pressed to resign, going so far as to say he was "coerced into resigning and was informed that there would not be a fair investigation." Doc. [126-2] ¶¶ 146, 151. Plaintiff compared the meeting with Chief Struttmann to his combat experience and its stresses, reporting that he signed the resignation because he believed he had no other options. Doc. [126-1] ¶¶ 22-23. Further, Plaintiff claims that "Defendant Struttmann's statements implied to Plaintiff that Defendant Batzel was aware of and was working together with Defendant Struttmann in the decision to terminate Plaintiff." Doc. [28] ¶ 16.[4]

According to Defendants, Plaintiff informed Chief Struttmann that he wanted to resign, then completed and signed a blank resignation form, Doc. [116] ¶¶ 146-49, while Plaintiff states that he "eventually gave in" after "being asked repeatedly and pressed to resign," explaining that he "only completed as much of the form as instructed and coerced by Defendant Struttman," Doc. [126-2] ¶ 149. Captain Milatovic signed the resignation form as a witness and Chief Struttmann signed it as the group manager. Doc. [116] ¶ 150. Defendants claim that Plaintiff could have waited for the investigation to be completed before resigning, *id.* ¶¶ 151, which

---

[4] The Court dismissed Plaintiff's claims against Batzel on the grounds that Plaintiff's "subjective impression of Defendant Batzel's involvement," based only on Struttmann's alleged statement that City Administrator Batzel would terminate Plaintiff's employment, did not support a reasonable inference that Batzel engaged in misconduct. Doc. [69] at 3-4; Doc. [28] ¶¶ 15-16.

3

Plaintiff disputes on the basis that he "was coerced into resigning and informed that there would not be a fair investigation and that Chief Struttmann told Plaintiff he was going to recommend his termination." Doc. [126-2] ¶ 151. The parties agree that applicable disciplinary policies allowed him to respond to the Chief of Police before the imposition of any recommended discipline and to appeal any disciplinary action. Doc. [116] ¶¶ 198, 199.[5] It is also undisputed that, at the time of Plaintiff's resignation, the City Administrator had not made any decision to terminate Plaintiff, *id.* ¶ 152, although Plaintiff argues that the city administrator merely "rubber stamps" recommendations for employee terminations, *see* Docs. [126-1] ¶ 24, [126-2] ¶ 152.

Plaintiff brought this action under 42 U.S.C. § 1983 against the City of St. Peters, Police Chief Rick Struttmann in his official and individual capacities, and City Administrator Russ Batzel in his official and individual capacities, alleging First Amendment retaliation arising from constructive termination of Plaintiff's employment after he shared the controversial video clip. Doc. [28] ¶¶ 1-7, 28, 32. Plaintiff alleges that because City Administrator merely "rubber stamps" decisions from the police chief, "Defendant Struttmann terminated Plaintiff's employment" by forcing him to resign. Doc. [126-2] ¶¶ 11-13; Doc. [28] ¶ 15. On November 22, 2021, the district court granted Defendants' combined motion to dismiss the Amended Complaint. *See* Doc. [30]. The Eighth Circuit Court of Appeals reversed, finding that Plaintiff had plausibly alleged that he was speaking as a private citizen on a matter of public concern when he sent the video. *Bresnahan v. City of St. Peters*, 58 F.4th 381, 384-386 (8th Cir. 2023). The Eighth Circuit cautioned, however, that " [o]ur ruling today does not mean that Bresnahan will ultimately prevail . . . While Bresnahan has met the threshold showing required to advance his First Amendment claim, we express no opinion on the merits of that claim." *Id.* at 386. The official capacity claims against Chief Struttmann and City Administrator Batzel were later

---

[5] Plaintiff does qualify his concession that "the Police Department's discipline policy affords the accused employee 'an opportunity to present a written or oral response to the Chief of Police prior to the imposition of any recommended discipline," Doc. [116] ¶ 198, as follows: "Uncontroverted that the policy includes this provision, *but it did not apply in this instance*." Doc. [126-2] ¶ 198 (emphasis added). The Court deems his right to respond before the imposition of recommended discipline admitted for the following reasons: (1) He admits the existence of the policy. (2) The qualification is phrased in the past tense, suggesting that he is describing what happened as a matter of fact, not what rights he would have had if he had chosen not to resign. (3) He nowhere attests that his rights under the policy would have been denied to him if he had chosen to allow the investigation to go forward.

dismissed, leaving only the individual capacity claim against Chief Struttmann and the claim against the City of St. Peters.  Doc. [69].

## LEGAL STANDARD

A court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56.  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (quotation marks omitted).  The non-movant must then "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'"  *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1).  The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party."  *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013) (citing *Davis v. United States Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate."  *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting *Anderson*, 477 U.S. at 250).

5

## DISCUSSION

"To establish a prima-facie case of unlawful retaliation for protected speech," Plaintiff must prove three elements: (1) he engaged in protected First Amendment Activity, (2) his employer "took an adverse employment action against him," and (3) the "protected speech was a substantial or motivating factor" in taking the adverse employment action. *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020) (quoting *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009). Before examining whether Plaintiff was terminated for exercising his free speech rights, the Court addresses the threshold issue of whether Plaintiff was terminated at all.[6]

To survive summary judgment, Plaintiff must show either that his resignation was involuntary or that he was constructively discharged. Because it is unclear whether Plaintiff alleges a theory of involuntary resignation or constructive discharge, the Court reviews Plaintiff's claims under both theories. In the Complaint, Plaintiff alleges that Chief Struttmann "ordered him to resign," that his termination "constitutes constructive discharge," and that Chief Struttmann's "comments and assurance that Plaintiff would be fired if he did not resign rendered Plaintiff's working conditions intolerable and forced Plaintiff to resign." Doc. [28] ¶¶ 15, 18, 19. Defendants' position is that "Plaintiff chose to resign in an attempt to save face, and now seeks to recharacterize his voluntary resignation as a 'constructive termination' in order to extract money damages from the City." Doc. [112] at 1. Defendants' Memorandum in Support of Summary Judgment addresses constructive discharge, while Plaintiff's Memorandum in Opposition argues that the resignation was involuntary, and the Complaint sounds in both theories. Docs [112] at 24, [126] at 13, [28] ¶ 18 ("constructive discharge by Defendant Rick Struttmann"); [28] ¶ 19 ("forced Plaintiff to resign"). Under either theory, summary judgment is warranted.

---

[6] The cases Plaintiff cites in opposition are inapposite because they feature a concrete adverse action from the employer, usually an outright firing. *See, e.g.*, *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 830 (8th Cir. 2015) ("The Board sent Anzaldua a termination letter[.]"); *Locurto v. Giuliani*, 447 F.3d 159, 163 (2d Cir. 2006) ("defendants fired the plaintiffs . . .[and Mayor Rudy Guiliani announced that t]hey will be fired."); *Marquardt v. Carlton*, 2023 WL 395027, at *1 (6th Cir. Jan. 25, 2023) ("When an investigation determined that Marquardt authored the posts, he was fired.").

I.      **Plaintiff has not made a submissible case that his resignation was involuntary.**

Plaintiff alleges that he was coerced into resigning from his position and thus his resignation is tantamount to a termination.  Doc. [126] at 13, 15.  In the Eighth Circuit, a resignation is presumed voluntary "unless the employee comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1544 (8th Cir. 1992) (citing *Alvarado v. Picur*, 859 F.2d 448, 453 (7th Cir. 1988).  If the resignation is voluntary, the employee is deemed to have waived the procedural rights to which they are otherwise entitled.  *Id.* (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 n.7 (4th Cir. 1988)).

"Under the 'duress/coercion' theory, a resignation may be found involuntary if, from the totality of the circumstances, 'it appears that the employer's conduct in requesting or obtaining the resignation effectively deprived the employee of free choice in the matter.'" *Angarita*, 981 F.2d at 1544 (quoting *Stone*, 855 F.2d at 174).  In the Eighth Circuit, factors considered include: "(1) [w]hether the employee was given an alternative to resignation; (2) [w]hether the employee understood the nature of the choice he was given; (3) [w]hether the employee was given a reasonable time in which to choose; (4) [w]hether the employee was permitted to select the effective date of resignation." *Id*. (citing *Stone*, 855 F.2d at 174).  A resignation is involuntary if "(1) [t]he employee involuntarily accepted the terms of his or her employer; (2) [t]he circumstances permitted no other alternative; and (3) [t]he circumstances were the result of coercive acts of the employer." *Id.*  The factors are "measured by an objective standard, as opposed to the employee's subjective evaluation of a situation." *Id.* at 1544-45 (citing *Christie v. United States*, 518 F.2d 584, 587 (1975)).

In *Angarita*, the Eighth Circuit found that the plaintiffs had presented sufficient evidence to rebut the presumption of voluntariness where the record showed that the police officers were "threatened with disclosure of the allegations to their family . . . [and] with adverse publicity in the media"; they were "told that they would not leave with their jobs" and that the person with final policymaking authority "had already decided that they would be fired"; they "were threatened with arrest"; and they were "interrogated continuously for several hours," among other things.  *Id.*  Under those circumstances, the Eighth Circuit found that the officers had "absolutely no choice" but to resign, noting that "the only alternative presented was that they

7

could continue to refuse to give in to the high pressure and permit their families to be contacted, to be placed in jail and fired, and to be publicly embarrassed in the media." *Id.* at 1541

Here, Plaintiff signed his resignation form within 15 minutes of when he was ordered to arrive at the police station.  Doc. [126-1] ¶ 21; Doc. [116] ¶ 142.  He was told that "if he resigned that morning, no investigation would commence into . . . Plaintiff's comment, and nothing would be reported on his peace officer license," but that if he did not resign, Chief Struttmann would open an investigation and ultimately recommend termination.  Doc. [28] ¶ 15; Doc. [126-1] ¶ 21.  In his deposition, Plaintiff explained that he was told, "I need to resign immediately, or there would be an investigation[.]"  Doc. [126-5] at 110:18-20.  Plaintiff elaborated that, "[w]hen you hear the word investigation in the realm of law enforcement, you immediately start to think [there] was a crime committed.  And with the intensity that they were coming at me, it made me feel like they were going to come after me for a hate crime or something."  *Id.* at 132:2-7.  Plaintiff reported feeling panicked, like he did during combat as a Marine.  Doc. [126] at 14.  Further, Plaintiff notes that he was called to the station at 9:45 a.m. after only two hours of sleep because he had ended his shift at 6:00 a.m.  *Id.* at 3; Doc. [116] ¶¶ 110, 142.

Plaintiff argues that "[his] situation is identical to the officers in *Angarita*."  Doc. [126] at 13.  Viewing the factual record in the light most favorable to Plaintiff and drawing every reasonable inference in his favor, the Court disagrees.  To begin with, Plaintiff does not claim to have been interrogated at length or threatened with arrest or public humiliation.  Further, on Plaintiff's own account, Chief Struttmann did not leave Plaintiff with no alternative to resignation. *See* Doc. [126-5] at 110:18-20 ("He said, I need to resign immediately, or there would be an investigation that would go to city hall.  At the end of that investigation, he was going to *recommend* I be terminated, regardless.") (emphasis added).  Plaintiff admits that, at the end of any investigation, he would have had the opportunity to respond to the Chief of Police before the imposition of any recommended discipline, and if necessary, he could appeal any disciplinary action.  *See* Doc. [126-2] ¶¶ 198-99.  He does not claim to have been interrogated, threatened with humiliation, or even told that he would certainly be fired—never mind, prosecuted—if he chose not to resign.  Thus, even in his own telling, his situation differed dramatically from that of the officers in *Angarita*.

The fact that Plaintiff "felt [as he did] when he was in combat" is immaterial to the voluntariness inquiry.  Doc. [126] at 14.  The voluntariness analysis is an objective inquiry, not

based on an employee's subjective mindset or feelings. *Angarita*, 981 F.2d at 1545.  Having conducted that inquiry, giving Plaintiff every benefit he is entitled to on review of the factual record at summary judgment, the Court finds that he has not come forward with sufficient evidence for a reasonable factfinder to find that his resignation was "involuntarily extracted." *Angarita*, 981 F.2d at 1544.

## II.    Plaintiff has not made a submissible case that he was constructively discharged.

Although Plaintiff's opposition to summary judgment focuses on involuntary discharge, his Complaint also alleges "constructive discharge."  Doc. [28] ¶ 18.  A plaintiff may pursue a constructive discharge claim even if he voluntarily resigned, but "[t]he bar to show constructive discharge is high."  *Bell v. Baptist Health,* 60 F.4th 1198, 1203 (8th Cir. 2023) (citing *O'Brien v. USDA,* 532 F.3d 805, 810-11 (8th Cir. 2008).  To prove constructive discharge, a plaintiff must show (1) that a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit.  *Parker v. USDA*, 129 F.4th 1104, 1114 (8th Cir. 2025) (citing *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007)).  Additionally, "[a]n employee must . . . grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment."  *Bell*, 60 F.4th at 1203 (quoting *Rester v. Stephens Media, LLC,* 739 F.3d 1127, 1132 (8th Cir. 2014)).  "An employer's insensitive actions do not necessarily leave a reasonable employee with no choice but to resign."  *Thompson v. Kanabec Cnty.*, 958 F.3d 698, 707 (8th Cir. 2020) (citing *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019)).

In *Thompson*, the plaintiff was put on paid administrative leave while alleged misconduct was investigated.  958 F.3d at 703.  A few weeks later, outside counsel recommended to the board of decision-makers that she be terminated.  *Id.*  Thompson's supervisor told her that "the Board would allow her to resign in lieu of termination" around the same time that she requested medical leave to undergo a necessary surgery.  *Id.* at 704.  Shortly after her surgery, Thompson resigned.  *Id.*  Following her resignation, she sued her former employer, alleging interference with the exercise of her rights protected by the Family Medical Leave Act under a theory of constructive discharge.  *Id.* at 705.  In upholding the district court's award of summary judgment to her employer, the Eighth Circuit held that, because Thompson was given the option to resign and elected to do so, her resignation did not amount to constructive discharge.  *Id.* at 707-08.  Her employer's actions were "perhaps insensitive in light of the recency of her surgery," but they

did "not amount to 'intolerable working conditions.'" *Id.* at 708.

Similarly here, while it was perhaps insensitive for Chief Struttmann to call Plaintiff back to the station only a few hours after his shift ended and tell him that he put his fellow officers' lives in danger after making him wait in "awkward silence," Docs. [116] ¶¶ 142-45, [126-2] ¶ 143, such circumstances do not amount to "intolerable working conditions." *Thompson*, 958 F.3d at 708.   Further, even assuming a reasonable person could find the prospect of being investigated intolerable, "[a]n employee must . . . grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment." *Bell*, 60 F.4th at 1203 (quoting *Rester*, 739 F.3d at 1132).  Plaintiff could have waited for the investigation to unfold, but he chose to resign instead, depriving his employer of any opportunity to correct the condition. *See* Doc. [126-5] at 110:18-20; Doc. [114-4] at 79:2-9.  Thus, even interpreting the record in the light most favorable to Plaintiff, no reasonable factfinder could find that it meets the high bar for constructive termination.  *Bell*, 60 F.4th at 1203.

Viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, he has not presented sufficient evidence for a reasonable factfinder to find that his resignation was involuntary or that he was constructively discharged.  Lacking sufficient evidence that he suffered an "adverse employment action," Plaintiff cannot make a prima facie case for unlawful retaliation for protected speech against any Defendant.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [111], is **GRANTED.**

**An Order of Judgment will accompany this Memorandum and Order.**

Dated this 31st day of March, 2026.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

10